RSR CORPORATION, Petitioner,

v.

William E. BROCK, Secretary of Labor and Occupational Safety and Health Review Commission, Respondents.

No. 83–4083.

United States Court of Appeals, Fifth Circuit.

July 1, 1985.

Akin, Gump, Strauss, Hauer & Feld, Alan J. Statman, Washington, D.C., for petitioner.

Judith N. Macaluso, Elizabeth S. Woodruff, Dept. of Labor, Office of the Solicitor, T. Timothy Ryan, Jr., Sol., Dept. of Labor, Ray Darling, Executive Sec., OSHRC, Washington, D.C., for respondents.

Mary-Win O'Brien, Pittsburgh, Pa., for United Steelworkers of America.

Before RUBIN, RANDALL and HIGGINBOTHAM, Circuit Judges.

RANDALL, Circuit Judge:

The Occupational Safety and Health Administration cited RSR Corporation for violations of OSHA's lead standard at three of the corporation's secondary lead refining plants. RSR Corporation contested the citations, and three separate enforcement proceedings were conducted before administrative law judges. The Occupational Safety and Health Review Commission granted discretionary review of each of the administrative law judges' decisions and consolidated the three cases for consideration. The Commission ultimately found that RSR Corporation willfully violated an OSHA regulation which requires disclosure to employees of certain safety and health data and provisions of the lead standard which require the payment of regular wages to employees who, because of elevated levels of lead in the blood, have been temporarily removed from the workplace. The Commission assessed penalties against RSR Corporation and remanded the cases to the administrative law judges for determination of the amount of benefits owed to various employees who, because of missed workdays attributable to lead exposure, have suffered a loss of wages.

RSR Corporation petitioned for review of the Commission's orders in the consolidated cases. The Secretary of Labor moved to dismiss the petition for lack of jurisdiction on the ground that, because of the remands to determine the amount of wages owed to various employees, the Commission's orders are not final. A screening panel of

this court denied the motion. *See RSR Corp. v. Donovan*, 733 F.2d 1142 (5th Cir. 1984). We have since heard oral argument, and we turn now to an analysis of the merits of RSR Corporation's petition for review. Because we find that the Commission's interpretation of the lead standard is reasonable and that its findings of fact are supported by substantial evidence, we affirm the orders in all respects.

## I. FACTUAL AND PROCEDUREAL BACKGROUND

### A. *The Lead Standard*

In November 1978, the Occupational Safety and Health Administration ("OSHA") issued a new standard (the "lead standard") designed to protect workers from the hazards of exposure to lead in the workplace.[1] The lead standard has been the subject of extensive public comment and judicial review; a comprehensive analysis of its provisions is not necessary in this proceeding. We note generally that the standard seeks to reduce the harmful effects of lead exposure by requiring employers to reduce the amount of airborne lead to which employees are exposed and to remove from the workplace altogether those employees for whom continued lead exposure is unsafe. To implement these controls, the lead standard requires both environmental monitoring of the workplace and biological monitoring of employees. This case is primarily concerned with the provisions of the lead standard dealing with the removal of individual employees from lead exposure.

The lead standard provides that, if the amount of airborne lead in the workplace exceeds the "action level"[2] for more than thirty days per year, employers must periodically check the blood-lead levels of employees and conduct full-scale medical examinations. The standard further provides that, if monitoring reveals lead in the blood in excess of the applicable trigger level,[3] or if a medical examination results in "a final medical determination"[4] that an employee "has a detected medical condition which places the employee at increased risk of material impairment to health from exposure to lead," the employee must be temporarily removed from lead exposure. 29 C.F.R. § 1910.1025(k)(1)(i)–(ii). The latter ground for temporary removal is intentionally stated in imprecise terms so as to provide flexibility to examining physicians. Examples of the employees it is designed to cover include those with signs of lead poisoning despite low levels of lead in the

---

1. The lead standard is codified at 29 C.F.R. § 1910.1025 (1984). When the standard originally appeared at 43 Fed.Reg. 53,007 (1978), it was accompanied by a Preamble, 43 Fed.Reg. 52,952 (1978), in which OSHA states the reasons for adoption of the standard, and by four Attachments, 43 Fed.Reg. 54,354 (1978), which provide a more detailed and technical discussion of the reasons for the standard and the evidence considered by OSHA in adopting it.

2. The action level is 30 micrograms of lead per cubic meter of air (30 ug/m³). *See* 29 C.F.R. § 1910.1025(b) (1984).

3. The standard sets a final trigger level of 50 micrograms of lead per 100 grams of whole blood. 29 C.F.R. § 1910.1025(k)(1)(i)(D) (1984). The final trigger level is, however, gradually phased in over a four-year period. *Id.*

4. The standard defines a "final medical determination" as the outcome of either of two procedures: (1) the "multiple physician review mechanism," or (2) the "alternate physician determi-

nation mechanism." 29 C.F.R. § 1910.-1025(k)(1)(ii)(B).

The multiple physician review mechanism provides for review by the employer's doctor followed by an automatic right, at the employee's option (and at the employer's expense) to a second opinion from a doctor of the employee's choosing. If the two doctors agree, their conclusions constitute a final medical determination. If the two doctors disagree, they shall designate a third doctor whose conclusions shall constitute a final medical determination unless "the employer and the employee reach an agreement which is otherwise consistent with the recommendations of at least one of the three physicians." *Id.* § 1910.1025(j)(3)(iii).

The alternate physician determination mechanism simply provides that "[t]he employer and an employee or authorized employee representative may agree upon the use of any expeditious [medical review procedure] in lieu of the multiple physician review mechanism ... so long as the alternate mechanism otherwise satisfies the requirements contained in this paragraph." *Id.* § 1910.1025(j)(3)(vi).

blood, those who have medical conditions unrelated to work that may be aggravated by exposure to lead, and those who are pregnant or are planning to become so. *See* 43 Fed.Reg. 54,462–63 (1978). An employee who has been temporarily removed may return to his regular work when the amount of lead in his blood falls below certain prescribed levels or when another final medical determination reveals that he no longer has a medical condition which places him at increased risk. 29 C.F.R. § 1910.1025(k)(1)(iii)(A)(1)–(4).

An employee who has been temporarily removed from his regular job because of an elevated blood-lead level or because of a final medical determination that he is at increased risk from lead exposure may be reassigned to a low-exposure position or may be placed on medical leave. During the period of temporary removal, the employer must, however, provide him with

"medical removal protection" ("MRP") benefits, i.e., "the earnings, seniority and other employment rights and benefits" that he would have earned if he had been able to continue working in his regular position. *Id.* § 1910.1025(k)(2)(ii).[5] If an employer voluntarily removes an employee from the workplace because of "the effect of lead exposure on the employee's medical condition," the employer must nonetheless pay MRP benefits even though the removal was not mandated by the lead standard. *Id.* § 1910.1025(k)(2)(vii).[6]

The duration of the employer's duty to pay MRP benefits is one of the disputed questions in this case. The lead standard provides that, if an employee has been removed from lead exposure because of an excess amount of lead in the blood, the employer must provide MRP benefits for at least eighteen months. *Id.* § 1910.-1025(k)(2)(vi).[7] If, after eighteen months,

---

5. The MRP provision of the standard states:

(2) *Medical removal protection benefits—(i) Provision of medical removal protection benefits.* The employer shall provide to an employee up to eighteen (18) months of medical removal protection benefits on each occasion that an employee is removed from exposure to lead or otherwise limited pursuant to this section.

(ii) *Definition of medical removal protection benefits.* For the purposes of this section, the requirement that an employer provide medical removal protection benefits means that the employer shall maintain the earnings, seniority and other employment rights and benefits of an employee as though the employee had not been removed from normal exposure to lead or otherwise limited.

If, during the period of temporary removal, an employee receives workers' compensation benefits, the employer must provide the difference between the employee's regular wages and the amount of workers' compensation benefits attributable to lost earnings. The employer is not entitled to a credit for that portion of workers' compensation benefits attributable to "treatment related expenses." *Id.* § 1910.-1025(k)(2)(iv).

6. The obvious aim of this provision is to preclude employers from avoiding their obligation to pay MRP benefits through the simple expedient of voluntarily removing an employee from lead exposure just before his blood-lead level reaches the applicable trigger level. *See* 43 Fed. Reg. 54,472 (1978).

7. Section 1910.1025(k)(2)(vi) provides:

(vi) *Employees whose blood lead levels do not adequately decline within 18 months of removal.* The employer shall take the following measures with respect to any employee removed from exposure to lead due to an elevated blood lead level whose blood lead level has not declined within the past eighteen (18) months of removal so that the employee has been returned to his or her former job status:

(A) The employer shall make available to the employee a medical examination pursuant to this section to obtain a final medical determination with respect to the employee;

(B) The employer shall assure that the final medical determination obtained indicates whether or not the employee may be returned to his or her former job status, and if not, what steps should be taken to protect the employee's health;

(C) Where the final medical determination has not yet been obtained, or once obtained indicates that the employee may not yet be returned to his or her former job status, the employer shall continue to provide medical removal protection benefits to the employee until either the employee is returned to former job status, or a final medical determination is made that the employee is incapable of ever safely returning to his or her former job status.

(D) Where the employer acts pursuant to a final medical determination which permits the return of the employee to his or her former job status despite what would otherwise be an unacceptable blood lead level, later questions concerning removing the employee

the employee's blood-lead level has not decreased below the standard's return level, the employer shall obtain a final medical determination with respect to the employee's ability safely to return to work. If the doctors determine that the employee cannot yet, but may in the future, safely return to his former job, the employer must continue to pay MRP benefits. If, on the other hand, the doctors conclude that "the employee is incapable of ever safely returning to his or her former job status," the employer may then cease payment of MRP benefits. *Id.* As we develop later in this opinion, all parties agree that, under some circumstances, MRP benefits may also be terminated before the expiration of eighteen months of temporary removal. There is, however, considerable disagreement with respect to what those circumstances are.

OSHA scheduled the lead standard to become effective on March 1, 1979. Pursuant to section 6(f) of the Act, 29 U.S.C. § 655(f), various labor organizations and lead-industry employers, including RSR Corporation ("RSR"), filed petitions, prior to March 1, for preenforcement judicial review of the standard. The petitions were consolidated before the Court of Appeals for the District of Columbia Circuit. The petitions for review, of course, did not themselves prevent the lead standard from becoming effective on March 1. *See* 29 U.S.C. § 655(f) ("The filing of such petition shall not, unless otherwise ordered by the court, operate as a stay of the standard."). Various parties, however, asked the District of Columbia Circuit to stay implementation of the lead standard until completion of the preenforcement review process. On March 1, 1979, the court stayed portions of the standard, including the multiple physician review mechanism, but denied the motion to stay the MRP provision. *See United Steelworkers of America v. Marshall,*

1979 O.S.H. Dec. (CCH) ¶ 23,338 (D.C.Cir. 1979). Thereafter, a panel of the District of Columbia Circuit, in an opinion announced on August 15, 1980, upheld most of the lead standard against wideranging procedural and substantive attacks. *See United Steelworkers of America v. Marshall,* 647 F.2d 1189 (D.C.Cir.1980).[8] The Supreme Court in due course denied petitions for certiorari. *See Lead Industries Association v. Donovan,* 453 U.S. 913, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981).

### B. *RSR Corporation*

RSR is a secondary lead refiner. The corporation operates, either directly or through wholly owned subsidiaries, secondary lead refining plants in Dallas, Texas, Indianapolis, Indiana, and Wallkill, New York. It is undisputed that OSHA's lead standard applies to conditions and employees at each of these plants.

As noted, RSR participated in the preenforcement challenge to the lead standard before the District of Columbia Circuit. The validity of the MRP provision was "[o]ne of the most vigorously contested issues" in that proceeding. *United Steelworkers,* 647 F.2d at 1228. While OSHA regarded MRP "as a *sine qua non* of the lead standard," the lead industry viewed it as a workers' compensation scheme that is beyond OSHA's authority under the Act. *Id.* Despite this disagreement, the District of Columbia Circuit, on March 1, 1979, denied the request to stay the effective date of the MRP provision until its validity was judicially determined. Nevertheless, on April 12, 1979, John Depaul, the President of RSR, announced a "corporate policy" that RSR would *not* pay MRP benefits to employees as required by the lead standard unless and until a federal court determines that the MRP provision is a valid exercise of OSHA's authority. Instead, RSR stated

again shall be decided by a final medical determination. The employer need not automatically remove such an employee pursuant to the blood lead level removal criteria provided by this section.

8. The court upheld the validity of all of the provisions of the lead standard involved in this case. OSHA has, pursuant to the court's remand, conducted additional rulemaking proceedings with respect to other provisions of the standard that are not relevant here.

that it would simply pay any MRP benefits due under the contested regulation into an interest bearing escrow account and make the funds available to employees if and when the MRP provision was determined to be a valid regulation. RSR's policy statement concludes: "With respect to the remaining provisions of the OSHA Standard, RSR intends to comply with both the spirit and the letter of the law." [9]

During 1979, RSR followed the escrow policy at its Dallas, Indianapolis, and Wallkill plants and refused to pay MRP benefits directly to employees. In addition, RSR unilaterally terminated the employment of

certain workers, prior to the expiration of eighteen months of temporary removal status, on the recommendations of its physicians that they could never safely return to work in a lead environment.[10] Following termination, RSR did not make payments to the MRP escrow account on their behalf. Also in 1979, RSR refused to comply with the request of Issac Jackson, an employee and union leader at the Dallas plant, for production of OSHA Form 200, a summary and log of occupational injuries that employers are required by regulation to maintain and to make available to employees upon request.[11] RSR maintained that, be-

**9.** The full text of the policy statement is as follows:

> The following is our Corporate policy on Medical Removal Protection Benefits for people that are removed from the work site (Total Removal).
> RSR Corporation, after reviewing extensively the regulations issued by the Secretary of Labor relating to employee exposure to lead, and after consultation with counsel, believes that those portions of the regulations requiring a continuation of earnings to employees who have been removed from the work place is arbitrary, capricious, and beyond the authority of the Secretary of Labor under the Occupational Safety and Health Act of 1970. RSR Corporation has instructed its counsel to file the appropriate papers before the appropriate Federal Court to contest fully the legality of the Secretary's actions in this regard. In the interim, RSR Corporation, if the situation presents itself, will set aside and deposit with a federally insured financial institution, appropriate sums of money to cover any potential liability that may accrue if the OSHA Standard is found to be a valid exercise of the Secretary's power. This account will be specifically designated and segregated from any other accounts which RSR may have. All interest which may accrue will inure to the benefit of those affected employees.
> For those employees who are requested to be removed from the work place under applicable federal law, RSR will assist those employees in processing appropriate Worker's Compensation claims. For those employees that are required to be removed, RSR will continue to maintain their seniority positions on appropriate employee rosters.
> With respect to the remaining provisions of the OSHA Standard, RSR intends to comply with both the spirit and the letter of the law. If you have any questions, please feel free to contact me.

**10.** At Dallas, from March 1, 1979, until December 31, 1979, RSR temporarily removed twenty-

one employees from lead exposure for varying periods of time. Pursuant to its policy, RSR paid MRP benefits due to these employees into an escrow account, but did not pay any funds to the employees themselves. In addition, on November 19, 1979, RSR terminated the employment of seven of these employees and, on that date, stopped payments to the escrow account on their behalf. On the same day, RSR also terminated the employment of four other employees who had not been on temporary removal status; the corporation has never paid money into the escrow account on their behalf. On the date of termination, none of these employees had been on temporary removal status for a full eighteen months. The decision to terminate them was based on the unilateral decision of RSR doctors.

At Wallkill, employee Lester King was already on temporary removal status on the effective date of the lead standard. RSR paid King's MRP benefits into an escrow account until May 22, 1979. On that date, King's employment was terminated based on the unilateral recommendation of an RSR doctor. Escrow payments on King's behalf were terminated on that date.

At Indianapolis, in April of 1979, several employees who had been temporarily removed from lead exposure were assigned to a "special project crew," but worked fewer hours and received less pay than they would have in their normal assignments; other employees were temporarily removed from lead exposure but were not assigned other duties. RSR paid MRP benefits into an escrow account for some of these employees, but not for others.

**11.** 29 C.F.R. § 1904.7(b)(1) (1984) provides:

> (b)(1) The log and summary of all recordable occupational injuries and illnesses (OSHA No. 200) (the log) provided for in § 1904.2 shall, upon request, be made available by the employer to any employee, former employee, and to their representatives for examination and copying in a reasonable manner and at

cause Jackson was a plaintiff in a pending lawsuit against RSR, he could only obtain the requested records through the discovery mechanisms of the Federal Rules of Civil Procedure.

OSHA compliance officers determined that (1) the escrow policy, (2) the refusal to pay MRP benefits following a unilateral medical decision, made prior to the expiration of eighteen months of temporary removal, that employees should be terminated for lead-related health reasons, and (3) the refusal to disclose Form 200 constituted willful violations [12] of OSHA regulations. Separate citations were issued to RSR for its respective conduct at Wallkill, Indianapolis, and Dallas. RSR contested each of the citations, and formal complaints were filed before administrative law judges ("ALJs"). Each of the three complaints was submitted for resolution on stipulated facts. The Dallas ALJ determined that RSR violated the lead standard by (1) paying MRP benefits into the escrow account rather than directly to temporarily removed employees; (2) terminating MRP payments upon unilateral medical opinions that do not constitute "final medical determinations"; and (3) refusing to disclose the records requested by Jackson. The ALJ determined, however, that these violations were neither willful nor serious. The Wallkill ALJ determined that RSR violated the lead standard by paying MRP benefits into the escrow account while Lester King was on temporary removal status, but that again the violation was not willful. The Wallkill ALJ also found, contrary to the decision of the Dallas ALJ, that RSR did *not* violate the standard by terminating

King's MRP benefits based upon a unilateral medical determination. Finally, the ALJ in Indianapolis determined that the use of the escrow procedure was both an actual violation of the lead standard and a willful one.

The Occupational Safety and Health Review Commission ("Commission") granted discretionary review of the decisions of the three ALJs and consolidated the cases. The United Steelworkers of America intervened on behalf of the Secretary. The full Commission determined that RSR's escrow policy constituted a violation of the lead standard. In addition, a majority of the Commission determined that the violation was willful; Commissioner Rowland, however, dissented on this point. A majority of the Commission also determined that RSR's attempt to stop the accrual of MRP liability by terminating the employment of workers at both Wallkill and Dallas, although based upon its physicians' determinations that the workers could not safely return to lead exposure, violated the lead standard because the medical determinations were premature and were based upon improper criteria. Commissioner Rowland again dissented because, in his view, the determinations of RSR's physicians were a sufficient basis upon which to terminate RSR's obligation to pay MRP benefits. The majority again characterized this violation as willful. Finally, a majority of the Commission determined that the failure to disclose OSHA Form 200 was a willful violation. Commissioner Rowland again dissented from this characterization of the violation.[13]

---

reasonable times. The employee, former employee, and their representatives shall have access to the log for any establishment in which the employee is or has been employed.

**12.** The Act distinguishes between three types of OSHA violations for which different penalties are available: (1) willful or repeated violations; (2) serious violations; and (3) non-serious violations. *See* 29 U.S.C. § 666.

**13.** The Commission majority assessed the following penalties and entered the following orders:

(1) *Dallas:* $1,000 penalty for a willful violation of the access-to-records provision; $2,000 penalty for willful violations of MRP provision; remand to determine the amount of MRP benefits owed to eleven employees whose termination was ineffective to stop MRP liability;
(2) *Wallkill:* $1,000 penalty for a willful violation of the MRP provision; remand to determine the amount of MRP benefits owed to Lester King;
(3) *Indianapolis:* $6,000 penalty for willful violations of MRP provision; remand to de-

RSR claims that the Commission's interpretation of the lead standard is arbitrary and capricious and that its fact findings are not supported by substantial evidence. Specifically, RSR claims (1) that its escrow policy did not violate the lead standard and, alternatively, that the violation, if any, was not willful; (2) that its unilateral decision to terminate employees prior to the expiration of eighteen months of temporary removal status was sufficient to toll the accrual of MRP liability and, alternatively, that any violation in this regard was not willful; and (3) that the failure to provide OSHA Form 200 to Jackson was not a willful violation of the access-to-records regulation.

Although there are factual differences among the citations from Wallkill, Dallas, and Indianapolis, the issues raised by RSR are, for the most part, common to all three proceedings. Accordingly, in discussing RSR's claims, we shall differentiate between the three proceedings only where necessary to a complete understanding of the case.

## II. THE ESCROW POLICY

■ RSR argues first that payment of MRP benefits into an escrow account, rather than directly to the workers entitled to the benefits, does not violate the lead standard. This argument is utterly devoid of merit. The lead standard unambiguously requires the payment of MRP benefits directly to employees. *See* note 5, *supra.* The standard admits no exception to this requirement for escrow accounts or otherwise. Moreover, the District of Columbia Circuit unambiguously refused to stay the effective date of the MRP provision. *See United Steelworkers,* 1979 O.S.H.Dec. at 28,253. Nevertheless, RSR unambiguously announced its intention *not* to pay MRP benefits directly to employees. In fact, RSR has stipulated that at least twenty-two employees entitled under the clear terms of the standard to immediate MRP benefits during periods of temporary removal did not receive those benefits until

termine the amount of MRP benefits owed to

*after* the District of Columbia Circuit's decision in *United Steelworkers.* We cannot imagine a clearer case of conduct that violates the literal terms of the standard.

RSR maintains, however, that the payment of MRP benefits pursuant to its escrow policy did not violate the lead standard because the escrow policy was adopted in good faith and was a "reasonable and common sense" means of furthering the lead standard's purposes pending determination of the validity of the standard. This argument admits that the escrow policy does *not* comply with the regulation. Clearly, the argument bears solely on the nature of the violation, not on the existence of a violation *vel non. See Bunge Corp. v. Secretary of Labor,* 638 F.2d 831, 834 (5th Cir.1981); *see also Modern Drop Forge Co. v. Secretary of Labor,* 683 F.2d 1105, 1114 (7th Cir.1982); *Super Excavators v. Occupational Safety & Health Review Commission,* 674 F.2d 592, 595 (7th Cir.1981), *cert. denied,* 457 U.S. 1133, 102 S.Ct. 2958, 73 L.Ed.2d 1350 (1982).

RSR also argues that, even if payment of MRP benefits into an escrow fund constituted a "technical violation" of the lead standard, it cannot be considered a "willful violation." Although the Commission's finding to the contrary triggered a dissent, we are convinced that this claim is equally devoid of merit. Although the Act itself does not define "willful," we recently joined a majority of the other circuits that have considered the term's meaning in adopting the Commission's definition of willful conduct. "[F]or OSHA purposes, we define a willful violation as one involving voluntary action, done either with an intentional disregard of, or plain indifference to, the requirements of the statute [or regulation]." *Georgia Electric Co. v. Marshall,* 595 F.2d 309, 319 (5th Cir.1979). Assuming that the Commission applied the correct standard, the scope of our review is limited: we must uphold the Commission's determination that RSR's escrow policy constituted a willful violation of the lead

two employees.

standard if there is substantial evidence to support it. *See id.* at 319; *see also* 29 U.S.C. § 660(a) ("The findings of the Commission with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive.").

We do not need to look far to find substantial evidence to support the Commission's finding. RSR's statement of policy with respect to MRP benefits, which was announced after the District of Columbia Circuit refused to stay the MRP provision, states unequivocally that RSR as a matter of corporate policy intends to violate the express terms of the lead standard. *See* note 9, *supra.* Again, we have difficulty imagining a clearer example of a willful violation. It is undisputed that RSR was fully aware of the MRP provision and, in fact, sought a judicial stay to prevent its implementation on March 1, 1979. When the District of Columbia Circuit denied the stay, RSR simply announced, six weeks later, that it would not comply with the requirement that benefits be paid directly to employees. In other words, RSR voluntarily and intentionally disregarded the terms of the lead standard.

RSR argues that a violation is not willful " 'if the employer had a good faith opinion that the violation conformed to the requirement of the standard.' " *Donovan v. Mica Construction Co.*, 699 F.2d 431, 432 (8th Cir.1983) (quoting *C.N. Flagg & Co.* 1974–75 O.S.H.Dec. (CCH) ¶ 19,251 (1975)). While that proposition may be true, it is irrelevant to this case. There is substantial evidence, indeed overwhelming evidence, that, rather than possessing a good faith belief that its conduct conformed to the lead standard's requirements, RSR understood completely that its escrow policy did *not* conform to the MRP provision. Indeed, the corporate policy statement makes this clear beyond question. RSR may have had a subjective, good faith belief that the MRP provision was invalid and that the escrow policy was an adequate means of protecting the interests of both the employer and its employees pending resolution of the judicial challenge. This

simply was not RSR's call to make. RSR has not directed our attention to any authority for the proposition that an employer may simply substitute its own judgment for that of OSHA or of a federal court construing an OSHA regulation. To the contrary, an employer must follow the law even if it has a good faith belief that its own policy is wiser. *E.g., Intercounty Construction Co. v. Occupational Safety & Health Review Commission*, 522 F.2d 777, 780 (4th Cir.1975), *cert. denied*, 423 U.S. 1072, 96 S.Ct. 854, 47 L.Ed.2d 82 (1976). We are wholly unconvinced, moreover, by RSR's claim that the escrow policy furthered the objectives of the lead standard. The objective of the MRP provision is that employees who are temporarily removed from lead exposure should not suffer any loss of income. It is undisputed in this case that, because of RSR's escrow policy, at least twenty-two employees suffered a loss of income from the date of temporary removal until after the decision in *United Steelworkers* when RSR finally decided to comply with the MRP provision. In short, the Commission's finding of a willful violation of the lead standard is supported by substantial evidence.

This conclusion disposes of all of the claims raised with respect to the escrow policy with one exception. At the Indianapolis plant, RSR established a "special project crew" which performed general maintenance in low-exposure areas around the plant. RSR stipulated that "[t]he 'special project crew' is comprised of those employees removed from [RSR's] facility due to elevated blood lead levels." RSR also stipulated that, in April 1979, Jimmy Calhoun and Arthur Strong were assigned to the special project crew and, "[b]y virtue of being reassigned" to the crew, they worked fewer hours than they would have otherwise worked during the week of April 16. RSR did not compensate them for the diminution in wages occasioned by the reassignment. The Commission concluded that this failure constituted a willful violation of the MRP provision of the lead standard.

■ RSR argues that there is no evidence that Strong and Calhoun were reassigned to the special project crew because of elevated blood-lead levels. This claim is frivolous. RSR stipulated that the special project crew consists of employees removed from lead exposure because of elevated blood-lead levels and that Strong and Calhoun were assigned to the special project crew. No explanation, other than elevated blood-lead levels, was offered for the assignment of Strong and Calhoun to the special project crew. The Commission's finding on this point is supported by substantial evidence.

### III. TERMINATION OF MRP BENEFITS

RSR terminated the employment of twelve employees because its physicians determined that they could no longer work safely in a lead environment. The parties stipulated to the specific bases for the medical determinations, though not with much detail. Eleven employees were terminated at the Dallas plant because of an "unusual propensity to absorb certain amounts of lead into [their] bloodstream[s] and tissues" and because their "blood lead levels tend to increase in disproportionate fashion to those blood lead levels of other employees with similar or equivalent exposure." RSR determined for each of the eleven employees that "temporary removal from [the] working environment will not alleviate the problem permanently." The parties also stipulated that at the Wallkill plant, Lester King was terminated because an RSR physician determined that he has "a decreased ability to excrete lead" and a "propensity to absorb or retain lead concentrations and ... [an] inability to excrete lead ... [that] significantly exceed[s] these 'functions' of other employees similarly exposed to lead." On the date of termination,

it is undisputed that King "exhibited no signs of lead toxicity."

The Commission determined that RSR's termination of these employees for the stated reasons was insufficient to also terminate the obligation to provide them with MRP benefits and that the failure to pay those benefits following termination constituted a willful violation of the lead standard. The Commission noted that, for an employee removed from the workplace solely because of an elevated blood-lead level, the standard provides in effect that MRP benefits must be paid for at least eighteen months, unless the employee is returned to work. After eighteen months, the employer's obligation to pay MRP benefits may terminate upon a final medical determination that the employee can never safely return to work in a lead environment. The Commission also noted, on the other hand, that the standard is silent with respect to the termination of an employer's MRP obligations to an employee removed for lead-related reasons other than an elevated blood-lead level. Based upon statements in the Attachments to the Preamble,[14] however, the Commission concluded that a final medical determination that an employee may not safely return to a lead environment may be made, prior to the expiration of eighteen months of temporary removal, in certain exceptional circumstances. The Commission did not delineate those circumstances in detail, but noted that determinations based upon permanent, irreversible neurological impairment and kidney disease are examples. The Commission also concluded that, when MRP benefits are terminated prior to the expiration of eighteen months of temporary removal, the employer bears the burden of demonstrating that termination was based on exceptional circumstances, such as neurological impairment or kidney disease, and not

---

**14.** Attachment C to the Preamble states in part:

> The standard is not intended to preclude all final medical determinations formed prior to the end of 18 months of removal which decide that a particular worker's condition will never permit a return to a lead-exposed job. Determinations of this nature might arise with respect to permanent, irreversible neurological impairment, and kidney disease. The standard does, however, embody the judgment that such medical determinations cannot be quickly made with respect to blood lead level declines.

43 Fed.Reg. 54,469 (1978).

on elevated blood-lead levels. Because it was stipulated that the terminations were based solely upon the capacity to absorb and excrete lead, RSR did not, in the Commission's view, discharge that burden here. Accordingly, the Commission did not reach the question whether the unilateral nature of the medical determinations also constituted a violation of the lead standard.[15]

 As we have already noted, we must accept the Commission's fact findings on this issue if they are supported by substantial evidence. The scope of our review of interpretive conclusions is also quite deferential. With respect to the scope and meaning of regulations promulgated under the Act, the interpretation of both the Commission, *see H.B. Zachry Co. v. Occupational Safety & Health Review Commission*, 638 F.2d 812, 817 (5th Cir.1981), and the Secretary of Labor, *see Brennan v. Southern Contractors Service*, 492 F.2d 498, 501 (5th Cir.1974), are entitled to great weight. "[O]ur standard of review is whether ... [the interpretation of the regulation] is unreasonable or inconsistent with the regulation's purpose." *H.B. Zachry*, 638 F.2d at 817. While we may favor the Secretary's interpretation in the event of disagreement, when, as in this case, "the Secretary and Commission agree ... the company bears a heavier burden in demonstrating that the Secretary's interpretation is unreasonable." *Floyd S. Pike Electrical Contractor v. Occupational Safety & Health Review Commission*, 576 F.2d 72, 75 n. 4 (5th Cir.1978); *see also McGowan v. Marshall*, 604 F.2d 885, 889 n. 17 (5th Cir.1979). In fact, their " 'interpretation is controlling as long as it is one of several reasonable interpretations, although it may

not appear as reasonable as some other.' " *H.B. Zachry*, 638 F.2d at 817 (quoting *Brennan*, 492 F.2d at 501).

The disagreement in this case centers on the proper construction of the language in the Attachment to the Preamble relating to the duration of the MRP obligation. Both sides agree that, when removal is based on the employee's blood-lead level alone, eighteen months of benefits are required; both sides also agree that the Attachment makes absolutely clear that the full eighteen months of MRP benefits are not mandatory in every case. The Secretary maintains, however, that the exception recognized in the Attachment applies only to medical determinations based upon "permanent, irreversible disease." RSR apparently maintains, on the other hand, that the exception applies to any medical conclusion that an employee cannot return safely to work as long as that conclusion is not based solely upon the amount of lead in the employee's blood at the time the determination is made. RSR argues, moreover, that the employees at issue were not terminated solely because of elevated blood-lead levels, but because of medical conditions, i.e., an increased propensity to absorb lead and a decreased capacity to excrete lead, that made it unsafe for them ever to return to work in a lead environment.

██ RSR argues in essence that a termination based upon an employee's propensity to absorb lead at a high rate or to excrete lead at a low rate is fundamentally different than a termination based upon an elevated level of lead in an employee's blood at a given time, and that the eighteen-month period only applies when removal is based on the latter consideration.

**15.** The Secretary has argued below that, even if the terminations were based on proper criteria, the lead standard was nonetheless violated because RSR made the medical decisions unilaterally. The Secretary argued that, although the District of Columbia Circuit stayed the multiple physician review mechanism, it did not expressly stay the alternate physician review mechanism which guarantees employees a voice in determining the manner of reaching medical conclusions. Because the employees here were not given such a voice, the Secretary concluded

that, at any rate, RSR's physicians' determinations were ineffective to toll the accrual of MRP liability. RSR argued, on the other hand, that the alternate physician review mechanism is inextricably linked to the multiple physician review mechanism and that the stay of the latter necessarily extended to the former. Therefore, RSR argued, it was free to reach unilaterally final medical determinations. Because of our disposition of this claim, we too need not address this issue.

We agree that such a distinction exists. We must, however, reject RSR's argument because we conclude that the Commission reasonably interpreted the eighteen-month requirement to apply to both types of removals. We need not, therefore, flesh out the full scope of the exception. As the Attachment makes clear, OSHA was well aware that the rate of lead absorption and lead excretion varies from employee to employee. In fact, OSHA expressly considered these variables in establishing the permissible exposure limit. *See* 43 Fed. Reg. 54,428 (1978). Moreover, the Attachment makes clear that OSHA considered these variables as well in determining that, in the case of removals for elevated blood-lead levels, MRP benefits should be provided for at least eighteen months. OSHA concluded that, precisely because of the fact that excretion rates and absorption rates vary, an employer cannot quickly make a determination that, because of an existing elevated blood-lead level, it will be unsafe for an employee ever to return to work. Such a determination must await the expiration of at least eighteen months of temporary removal. OSHA's comments are reasonably subject to the interpretation that such a determination also cannot be made quickly from the rate at which an employee absorbs or excretes lead from the blood—the precise criteria upon which RSR doctors relied. To the contrary, the Commission reasonably concluded that absorption and excretion rates must be observed over a period of time. As the Attachment states:

> The preceding data illustrates that some long-term lead workers will excrete lead at an extremely slow rate, while other workers with comparable prior exposures will rapidly excrete lead upon removal. *OSHA is convinced that there is no possibility of determining in advance how any particular worker will respond to a removal.* At some point, however, it should become clear to what extent the blood lead level of a removed worker is likely to soon decline to acceptable levels. OSHA believes that at this point a medical determination should be

made as to the propriety of continuing the worker's removal. With this in mind, the standard provides a medical examination for workers whose blood lead levels have not adequately declined within 18 months of removal.

 . . . . .

The standard does, however, embody the judgment that ... medical determinations [about the ability of employees to return safely to work] cannot be quickly made with respect to blood lead level declines. Little is firmly known about the complicated dynamics of individual worker's lead excretion. It would be premature to attempt to quickly assess the nature of a specific long-term worker's future blood lead level declines. *The standard requires 18 months of removal before this medical determination is attempted so that the nature of a specific worker's excretion of lead has been documented and thus can be evaluated without concern for such confounding factors as recent substantial lead exposure.*

43 Fed.Reg. 54,469 (1978) (emphasis supplied).

These comments make clear that the Commission reasonably concluded that the effect of a high absorption rate or a low excretion rate on the employee's ability to return to work safely is not the kind of determination that can be made until at least eighteen months of removal has expired. Accordingly, RSR's argument that the employees at issue were not terminated solely because of the level of lead existing in their blood at the time of removal is unavailing. It is undisputed that they were terminated because of the rate at which their systems absorb and excrete lead. RSR's conclusion that "temporary removal will not alleviate the problem" was premature. The Commission's conclusion that violations of the lead standard occurred, therefore, is supported by substantial evidence.

A majority of the Commission also concluded that the violations in this respect

were willful. The majority concluded that, because RSR was intimately familiar with the MRP provision, and because, as the Attachments and Preamble make clear, termination of these employees for the stated reason was premature, RSR "could not have relied in good faith upon the determinations of its physicians that eleven terminated employees were incapable of ever safely returning to work in a lead environment." The Commission also noted there was no indication in the record that any of the terminated employees were, at the time of termination, suffering adverse health effects from lead exposure. Although this question is much closer than the issue of willfulness with respect to the escrow policy, we are mindful that, when we review for substantial evidence, we are not free to substitute our judgment for that of the fact finder. *See, e.g., Cook v. Heckler,* 750 F.2d 391, 392 (5th Cir.1985). We are convinced, moreover, that the stipulated record contains such "relevant evidence as a reasonable mind might accept to support a conclusion," *id.,* that RSR terminated the employees at issue in willful violation of the lead standard. We are satisfied that the lead standard is reasonably clear, that RSR was well aware of its requirements, and that, based upon the reasons given by RSR, the terminations were premature. We do not, contrary to RSR's suggestions, impugn the integrity of its physicians. We hold simply that the Commission reasonably concluded that the lead standard precludes termination based upon the criteria used by RSR's physicians until at least eighteen months of temporary removal have passed and that RSR could not reasonably have believed to the contrary.

## IV. DISCLOSURE OF OSHA FORM 200

██ The undisputed facts relevant to this claim are these: In 1978, Issac Jackson was president of the local union that represented RSR employees at the Dallas plant. In April, he submitted a written request to RSR, pursuant to 29 C.F.R. § 1904.7, *see* note 11, *supra,* for a copy of OSHA Form 200. Form 200 is "a log and summary of all recordable occupational injuries and illnesses" that employers are required to maintain. *Id.* § 1904.2(a). At the time of the request, Jackson was a named plaintiff in a lead intoxification class action lawsuit pending against RSR. RSR provided Jackson with the summary portion of Form 200, but refused to disclose the log portion. RSR took the position that, because the log was potentially useful to Jackson in the private litigation pending against RSR, the access provision of section 1904.7 did not apply and that Jackson could only obtain the log through a discovery request made pursuant to the Federal Rules of Civil Procedure. The lead intoxification class action was dismissed on June 14, 1979. On June 18, 1979, RSR informed OSHA that, because the suit had been dismissed, it would comply with Jackson's request. One week later, the log had still not been provided to Jackson, and on June 25, 1979, OSHA cited RSR for a violation of section 1904.7.

The ALJ determined that RSR violated the access regulation, but that the violation was not willful. The Commission reviewed only the latter determination and concluded that, because RSR disclosed the summary portion of Form 200, it obviously knew of the regulation's requirements and that, despite RSR's protestations of a good faith belief that the regulation did not apply, RSR intentionally violated the regulation. The Commission concluded that RSR's claim of good faith was refuted by the facts that (1) RSR delayed in providing the log following dismissal of the lawsuit and (2) RSR was unable to cite any authority for the proposition that the access regulation does not apply when records are requested by a party to a pending lawsuit.

RSR apparently now concedes that under section 1904.7 an employer must provide a copy of OSHA Form 200 to all employees, even those who are engaged in private litigation against the company. RSR maintains, however, that in 1979 its belief to the contrary was reasonable and was held in good faith. RSR claims to have relied on the general principle that "[s]tatutes or regulations governing access to information are not intended to be used as ...

discovery tool[s]," RSR Brief at 45, for which it cites *United States v. Murdock,* 548 F.2d 599 (5th Cir.1977). In that case, Murdock was indicted for willfully failing to file income tax returns. He admitted the violation, but sought to quash the indictment on the ground that he had been selectively prosecuted on account of his religious beliefs, in violation of the first amendment. In connection with the motion to quash, Murdock sought the production, under the discovery mechanism of the Federal Rules of Criminal Procedure, of various government documents. The discovery request was denied, and Murdock appealed. He argued for the first time on appeal that he was entitled to obtain the requested documents pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. We rejected this argument on the ground that the FOIA, although an independent means through which Murdock might be able to obtain the requested documents, did not modify the Federal Rules of Criminal Procedure to provide him a greater right of access than he would have otherwise had in the context of a criminal trial. We certainly did *not* hold in *Murdock,* however, that the existence of the discovery provision of the Federal Rules precluded resort to the FOIA as an alternative means of obtaining the documents. We simply held that the Federal Rules and the FOIA "provide two independent schemes," each with its own requirements, "for obtaining information through the judicial process." *Id.* at 602.

Although we do not find *Murdock* particularly relevant here, it cuts, if at all, against RSR's position. An analogy to *Murdock* results in the conclusion that section 1904.7 and the Federal Rules of Civil Procedure are alternative methods of discovering information, each of which is available according to its own terms. In short, RSR has offered nothing to support the claim that its interpretation of the regulation, which is contrary to its clear and unambiguous terms, was reasonable. Given this lack of authority, as well as RSR's decisions selectively to comply with section 1904.07 during the pendency of the suit and to delay disclosure after the lawsuit was

dismissed, we are convinced that the Commission's finding is supported by substantial evidence.

## V. CONCLUSION

For the reasons set forth above, the orders of the Commission are affirmed.

AFFIRMED.