**UNITED STEELWORKERS OF AMERICA, AFL–CIO–CLC and its Local Union 8394, et al., Petitioners,**

v.

**SCHUYLKILL METALS CORPORATION, and Occupational Safety and Health Review Commission, et al., Respondents.**

No. 86–4578.

United States Court of Appeals,
Fifth Circuit.

Oct. 2, 1987.

---

**19.** *See Fields v. Bowen,* 805 F.2d 1168, 1170 (5th Cir.1986) (citing *Lawler v. Heckler,* 761 F.2d 195, 198 (5th Cir.1985)).

Mary Win O'Brien, Asst. Gen. Counsel, Pittsburgh, Pa., for United Steelworkers of America.

Allen H. Feldman, Arthur J. Amchan, Joseph M. Woodward, Jeffrey A. Hennemuth, Steven J. Mandel, Attys., Washington, D.C., for Brock.

G. Michael Pharis, William A. Ziegler, New York City, for Amax.

Louis M. Phillips, Baton Rouge, La., for Schuylkill.

W. Scott Railton, Washington, D.C., for St. Joe.

Before GOLDBERG, HILL and JONES, Circuit Judges.

GOLDBERG, Circuit Judge:

The Secretary of Labor (Secretary) and the United Steelworkers of America (USWA) appeal from an order of the Occupational Safety and Health Review Commission (OSHRC or Commission). The order interprets the Medical Removal Protection (MRP) benefits provision of the lead standard, promulgated by the Secretary pursuant to § 6 of the Occupational Health and Safety Act, 29 U.S.C. § 655 (Act or OSH Act). 29 C.F.R. § 1910.1025(k). We hold that the Secretary gave the parties adequate notice of the issue in dispute; that the Secretary's interpretation of its regulation is reasonable and is thus owed substantial deference, irrespective of the reasonableness of OSHRC's decision; and that appellees' contention that the regulation as construed by the Secretary is "unenforceably vague" is wholly without merit. We therefore reverse the order of the Commission and remand for further proceedings.

The lead standard has been challenged by the industry in litigation from its inception. The courts, however, have not proved a receptive audience for the industry's well-orchestrated complaints. The present movement in this seemingly neverending symphony is but a minor variation on the prior themes. Thus, unlike a listener to Haydn, the industry should hardly be surprised at the outcome.

This symphony of lead litigation should not remain forever unfinished. The industry's arguments—in large measure resting on the policies underlying the lead stan-

dard—likely will continue to strike a discordant note in the courts. The industry must either accept legislative and regulatory atonality, or, if too painful for their ears (and pocketbooks), attempt to return the score to the composers of the lead policy for reorchestration.

## I. Factual and Regulatory Background

The stipulated facts are not in dispute. In 1975, when the Secretary first issued a notice of proposed rulemaking (NPRM) regarding the lead standard, there was no proposal relating to MRP or MRP benefits. 42 Fed.Reg. 46547. Informed by comments relating to the absence of an MRP provision, on September 16, 1977, the Secretary issued a supplemental NPRM relating solely to this issue. After holding extensive informal hearings and receiving substantial commentary, the Secretary issued a final standard with a comprehensive MRP provision. 43 Fed.Reg. 52952 (Nov. 14, 1978). This standard was accompanied by a lengthy preamble, which exhaustively set forth the Secretary's findings and reasons for promulgating this new standard. *Id.;* 43 Fed.Reg. 54354 (Nov. 21, 1978).

The standard contains a permissible exposure level (PEL) and an action level. 29 C.F.R. §§ 1910.1025(b), (c)(1). If airborne lead exposure surpasses the action level for more than 30 days annually, the employer must conduct biological and medical surveillance of the exposed employees. The employer must monitor employees' blood-lead levels and must administer medical examinations to determine whether the employees are at risk from lead exposure. 29 C.F.R. § 1910.1025(j)(2), (3).

The MRP provision mandates that, if biological tests or medical surveillance reveal that a worker has an especially high blood-lead level or may suffer a physical disability, he or she must be removed to a workplace area of relatively low lead exposure. 29 C.F.R. § 1910.1025(k). Alternatively, the employer may choose to reduce the number of hours the employee works or simply to lay off the employee. *Id.* But irrespective of the employer's choice, the MRP benefits provision instructs that "the employer shall maintain the earnings, seniority rights and other employment rights and benefits of an employee as though the employee had not been removed" for up to 18 months. 29 C.F.R. § 1910.1025(k)(2)(ii).

Before the Secretary had a chance to implement this nascent standard, the industry and the labor movement brought a pre-enforcement challenge on myriad substantive and procedural grounds. *United Steelworkers of America v. Marshall,* 647 F.2d 1189 (D.C.Cir.1980), *cert. denied sub nom. Lead Industries Ass'n v. Donovan,* 453 U.S. 913, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981). Judge Skelly Wright, in a painstaking and protracted opinion, upheld the standard in virtually every respect. *Id.* at 1203 & n. 6, 1311. Although the MRP benefits provision was "[o]ne of the most vigorously contested issues in the case," *id.* at 1228, the meaning and operative scope of this provision—the issue before this court—was not directly at issue there.

Acting under his enforcement power derived from § 9 of the Act, 29 U.S.C. § 658, the Secretary issued a citation against Amax Lead Company of Missouri (Amax) on March 17, 1980, charging that Amax had willfully violated the MRP benefits provision and assessing a civil penalty of $1,600. The company had removed six employees from areas of relatively high exposure to areas of low exposure, but, while paying the removed workers their pre-transfer base hourly wages, had failed to compensate the employees for overtime and for one-half hour lunch breaks that they would have earned but for the removal. Amax contested the citation before an administrative law judge (ALJ), who found a violation. The ALJ, however, found the violation to be de minimis rather than willful, and therefore vacated the civil penalty. The Secretary, the USWA, which had intervened as the collective bargaining representative of the employees, and Amax all requested review before the Commission.

On September 11, 1981, the Secretary issued a citation assessing a $60 civil penalty against St. Joe Resources Company (St. Joe), also alleging that the company had failed to pay a medically removed employee

the mandated MRP benefits. St. Joe failed to pay one employee the overtime pay and shift differential that he would have earned had he remained at his pre-transfer position. An ALJ affirmed the citation and the civil penalty, and ordered the company to make the employee whole. St. Joe appealed to the Commission.

On March 9, 1981, the Secretary issued a similar citation against Schuylkill Metals Corporation (Schuylkill), alleging that Schuylkill failed to comply with the MRP provision by refusing to pay premium payments to transferred employees. These premium payments consisted of overtime pay and production bonuses that the employees would have earned but for their removal, and the Secretary assessed a civil penalty of $3,960 for this "serious" violation. The ALJ found that the employees were transferred under a bona fide program of discipline and retraining.[1] The Secretary and the USWA sought review by the Commission.

OSHRC granted review, consolidated the cases and, on June 26, 1985, issued a decision. OSHRC found that the premium payments at issue were not comprehended by the term "earnings" in the definition of MRP benefits. The Commission reasoned that "earnings" was a term of art that could only be defined contextually and that the rulemaking history did not support the Secretary's interpretation that, when he promulgated the modified final standard, "earnings" contemplated such payments. The Commission also suggested that, if the Secretary had intended "earnings" to include such premium payments, "his action would be contrary to the spirit, and possibly the letter of notice-and-comment rulemaking," because the Secretary failed "to give the public fair notice" of this intent. Decision at 18–19 (citation omitted). The Secretary and the USWA take this appeal.

II. Notice

The Commission suggested, and appellees assert, that, even were it reasonable to

have included premium payments within "earnings" in the final rule, the Secretary failed to provide adequate notice in the supplemental NPRM that "earnings" contemplated such payments. Appellees accurately assert that the Secretary used the terms "rate of pay" and "earnings" interchangeably, and allegedly synonomously, in this NPRM. They therefore contend that the notice was inadequate.

■■■■ This syllogism is faulty. Before promulgating a rule, the Secretary must provide interested parties with notice in the Federal Register and an opportunity to comment. Such notice must "include[ ] either 'the terms or substance of the proposed rule or a description of the subjects and issues involved.'" *Action For Children's Television v. FCC*, 564 F.2d 458, 470 (D.C.Cir.1977) (quoting 5 U.S.C. § 553(b)). "The notice need not specifically identify 'every precise proposal which [the agency] may ultimately adopt as a rule.'" *American Transfer & Storage Co. v. ICC*, 719 F.2d 1283, 1303 (5th Cir.1983) (quoting *Action For Children's Television*, 564 F.2d at 470 (quoting *California Citizens Band Association v. United States*, 375 F.2d 43, 48 (9th Cir.), *cert. denied*, 389 U.S. 844, 88 S.Ct. 96, 19 L.Ed.2d 112 (1967)). Rather, "[t]he proper test is whether the notice would fairly appraise interested persons of the subjects and issues the agency was considering." *American Transfer*, 719 F.2d at 1303; *see also Pennzoil Co. v. FERC*, 645 F.2d 360, 371 (5th Cir.1981), *cert. denied*, 454 U.S. 1142, 102 S.Ct. 1000, 71 L.Ed.2d 293 (1982); *Daniel International Corp. v. OSHRC*, 656 F.2d 925, 932 (4th Cir.1981); *Steelworkers*, 647 F.2d at 1221; *American Iron & Steel Institute v. OSHA*, 577 F.2d 825, 830 (3d Cir.1978); *Action For Children's Television*, 564 F.2d at 470. Finally, the agency may decide to modify its original proposed rule; the rule is not required to "remain frozen in its original vestigial form." *South Terminal Corp. v. EPA*, 504 F.2d 646, 659 (1st Cir.1974). If, after notice and comment,

---

**1.** We neither express nor intimate any view regarding the validity of this finding, which involves both factual issues and an interpretation

of 29 C.F.R. § 1910.1025(k)(2)(vii), and which was not passed on by OSHRC.

the agency alters the proposed rule, a new comment period will not be required so long as the modified rule is a "logical outgrowth of the published proceedings." *Brazos Electric Power Co-Op v. SWPA,* 819 F.2d 537, 542 (5th Cir.1987); *see, e.g., Steelworkers,* 647 F.2d at 1221.

■ Viewed through the lenses of both the "fair appraisal" test and the "logical outgrowth" test, the Secretary provided adequate notice. On September 16, 1977, the Secretary provided notice in the Federal Register of an additional comment period concerning the "issue of appropriate protections for workers transferred or removed from lead exposure ..." 42 Fed. Reg. 46547. This notice did not propose any particular MRP benefit provision. Rather, the notice solicited comments and evidence and scheduled an informal hearing as to "whether, *and to what extent,* the [proposed lead] standard should require employers to protect employees who submit to medical surveillance and as a result are removed from lead exposures in order to preserve the employees' health." *Id.* (emphasis added). The notice stated that there should be MRP benefits "that would maintain the rate of pay, seniority and other rights of an employee ... [when] the employee is transferred or removed from his or her job as a result of an increased health risk from exposure to lead." *Id.* at 46548. The Secretary also requested comments and information relating to thirteen specific issues. In particular, the Secretary requested comments regarding "[w]hat should be the appropriate scope of th[e] [MRP] provision." *Id.*

These questions and descriptions more than adequately sufficed to apprise fairly an interested party that there was an issue regarding the breadth of MRP benefits. To apprise fairly interested parties—such as these sophisticated industry members who had challenged the lead standard along every step of the road—it certainly was not necessary that the Secretary spell out with particularity the proposed meaning of MRP benefits or "earnings." *See*

*American Transfer,* 719 F.2d at 1303; *Daniel International,* 656 F.2d at 932. It suffices that the interested parties were put on notice that there was an issue relating to the scope of the coverage of "earnings" or "rate retention." The Secretary explicitly requested comments in this regard. *See Steelworkers,* 647 F.2d at 1225 ("the question is ... whether the agency did a legally adequate job, not whether it did the best possible job.").

At least one party, the USWA, saw fit to comment on precisely this issue. 43 Fed. Reg. at 54466. In addition, other parties provided extensive comments relating to the importance of promulgating MRP benefits of extreme breadth and unprecedented scope. *Id.* at 54442–49. These commenters sought to ensure that workers would not have an economic disincentive to their voluntary cooperation in the medical surveillance program. *Id.* They also sought to force the industry to internalize the costs of lead exposure, thus giving employers incentives to reduce airborne lead levels to the PEL. *Id.* at 54449–50. Thus, it was readily apparent to interested parties that the scope of MRP benefits was in dispute. The comments received reflected such an understanding and provided additional support for the broad, final rule; the NPRM was "sufficiently descriptive of the 'subjects and issues involved' ... that interested parties ... offer[ed] informed criticism and comments." *Ethyl Corp. v. EPA,* 541 F.2d 1, 48 (D.C.Cir.) (en banc), *cert. denied sub nom. E.I. Dupont de Nemours & Co. v. EPA,* 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976) (quoting 5 U.S.C. § 553(b)). The NPRM therefore provided adequate notice of the final rule, broadly construed. Additionally, the evidence received and cited in the rulemaking history demonstrates that a comprehensive definition of "earnings" was a logical outgrowth of the rulemaking proceedings.[2]

### III. The Standard of Review and the Meaning of "Earnings"

The Secretary contends that the term "earnings" plainly contemplated the pay-

---

**2.** The evidence described in our discussion of the reasonableness of the Secretary's interpreta-

tion lends further support to our belief that the NPRM provided adequate notice.

ment of premium payments to employees who are medically removed. The Commission, however, canvassed the rulemaking history of MRP benefits and concluded that "earnings" could not be so construed. We thus must first address the proper standard of our review and whether we owe deference to the Secretary or to OSHRC.

## A. Standard of Review

■ Normally, the regulatory interpretation made by a policymaking agency charged with enforcement of a statute it administers is due considerable deference. " 'The ... administrative interpretation ... [is] of controlling weight unless it is plainly erroneous or inconsistent with the regulation.' " *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965) (quoting *Bowles v. Seminole Rock Co.,* 325 U.S. 410, 413–14, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)); *see Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 565, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980); *United States v. Larionoff,* 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977); *Mercy Hospital of Laredo v. Heckler,* 777 F.2d 1028, 1032 (5th Cir.1985).

■ By contrast, it is axiomatic that an agency charged only with adjudication is "not entitled to any special deference from the courts." *Potomac Electric Power Co. v. Director, OWCP,* 449 U.S. 268, 277 n. 18, 101 S.Ct. 509, 514 n. 18, 66 L.Ed.2d 446 (1980); *see Alford v. American Bridge Division, U.S. Steel Corp.,* 642 F.2d 807, 809 & n. 2 (5th Cir.1981), *cert. denied,* 455 U.S. 927, 102 S.Ct. 1292, 71 L.Ed.2d 472 (1982); *Peabody Coal Co. v. Blankenship,* 773 F.2d 173, 175 (7th Cir.1985); *Bethlehem*

*Mines Corp. v. Director, OWCP,* 766 F.2d 128, 130 (3d Cir.1985); *Hastings v. Earth Satellite Corp.,* 628 F.2d 85 (D.C.Cir.), *cert. denied,* 449 U.S. 905, 101 S.Ct. 281, 66 L.Ed.2d 137 (1980); *Tri-State Terminals, Inc. v. Jesse,* 596 F.2d 752, 757 n. 5 (7th Cir.1979); *Pittston Stevedoring Corp. v. Dellaventura,* 544 F.2d 35, 49–50 (2d Cir. 1976), *aff'd sub nom. Northeast Marine Terminal Co. v. Caputo,* 432 U.S. 249, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977).

■ Nevertheless, in this particular regulatory context, the question has arisen as to which agency interpretation is due deference: the Secretary charged with enforcement and policymaking, or OSHRC, charged with adjudication. This is an issue over which the courts of appeals have splintered.[3] But to whom we owe deference is an issue over which we need not tarry. Three times this court has addressed expressly this issue. Each time, we have decided without equivocation that, if the regulatory interpretation of the Secretary is reasonable, we must defer to his interpretation. *Brock v. Schwarz-Jordan, Inc.,* 777 F.2d 195, 196–97 (5th Cir.1985) (per curiam); *Marshall v. Southwestern Industrial Contractors & Riggers, Inc.,* 576 F.2d 42, 44–45 (5th Cir.1978); *Brennan v. Southern Contractors Service,* 492 F.2d 498, 501 (5th Cir.1974); *see RSR Corp. v. Brock,* 764 F.2d 355, 365 (5th Cir.1985). We have held repeatedly "that the *Secretary's* interpretation 'is controlling as long as it is one of several reasonable interpretations, although it may not appear as reasonable as some other.' " *Schwarz-Jordan,* 777 F.2d at 197 (quoting *Southwest-*

---

**3.** The First, Seventh and Tenth Circuits defer to the Secretary. *Donovan v. A. Amorello & Sons, Inc.,* 761 F.2d 61, 63–66 (1st Cir.1985); *Brock v. Chicago Zoological Society,* 820 F.2d 909, 912 (7th Cir.1987); *Brennan v. OSHRC and Kessler,* 513 F.2d 553, 554 (10th Cir.1975); *see also Brock v. Cathedral Bluffs Oil Co.,* 796 F.2d 533, 537 & n. 2 (D.C.Cir.1986) (Scalia, J.) (defering to the Secretary rather than to OSHRC in the context of the Federal Coal Mine Safety and Health Act of 1977, 30 U.S.C. § 801 *et seq.,* thus "leav[ing] interpretive discretion where it normally resides, with the policy-maker rather than the adjudicator.").

The Second, Fourth, Sixth, Eight and Ninth Circuits defer to OSHRC. *Marshall v. Western Electric, Inc.,* 565 F.2d 240, 244 (2d Cir.1977); *Brennan v. OSHRC and Giles & Cotting,* 504 F.2d 1255, 1261–62 (4th Cir.1974); *Usery v. Hermitage Concrete Pipe Co.,* 584 F.2d 127, 132 (6th Cir.1978); *Brennan v. OSHRC and Ron M. Fiegen, Inc.,* 513 F.2d 713, 715–16 (8th Cir.1975); *Brock v. Bechtel Power Co.,* 803 F.2d 999, 1000 (9th Cir.1986).

The Third Circuit defers to neither the Secretary nor the Commission when they advance alternative interpretations, but engages in independent review. *Bethlehem Steel Corp. v. OSHRC,* 573 F.2d 157 (3d Cir.1978).

*ern Industrial Contractors,* 576 F.2d at 44 (quoting *Southern Contractors Service,* 492 F.2d at 501)) (emphasis in original). In this case, the standard of review determines the outcome.

### B. The Meaning of Earnings

█ We have no difficulty upholding as reasonable the Secretary's interpretation that he intended "earnings" to comprehend such premium payments as paid lunch periods, shift differentials, overtime pay and production bonuses that employees would have accrued but for their removal. The Commission's decision to the contrary, and the argument of appellees, rests on two bases: first, that the term "earnings" has no fixed, natural meaning; and, second, that the rulemaking history lacks evidence of the Secretary's intent that "earnings" convey such a broad meaning, especially because the Secretary used the phrases "rate of pay" or "rate retention"—which had a fixed and historic meaning—interchangeably with the term "earnings" in the preamble. Therefore, the Secretary allegedly is attempting to amend the MRP benefits provision *ex post*, without complying with the legal requisites of notice-and-comment rulemaking.

We agree with OSHRC and appellees regarding the definition of "earnings"; like most words in the English language, it is a term of art that has no natural, immutable meaning. Were we constrained to ascertain the meaning of this term out of context, we would have considerable difficulty finding the interpretation of the Secretary reasonable. But this argument need not detain us. Viewed contextually, illuminated by the extensive rulemaking history, the Secretary's interpretation is manifestly reasonable, however reasonable the Commission's (or the appellees') alternative interpretations may be.

In promulgating the lead standard's MRP benefits provision, the Secretary was not venturing into virgin territory. When it enacted the Federal Coal Mine Health and Safety Act of 1969, Pub.L. No. 91–173, 83 Stat. 742 (codified as amended in scattered sections beginning with 30 U.S.C.

§ 801) (FMHSA), Congress included an MRP benefits provision that the Secretary was required to administer. This provision only requires that compensation in the event of transfer out of an area of high levels of coal dust shall be "at not less than the *regular rate of pay* received ... immediately prior to ... transfer." 30 U.S.C. § 843(b)(3) (emphasis added). The FMHSA MRP was also the subject of litigation, in which the D.C. Circuit held that this provision required only that a removed worker receive the base hourly wage of his or her position prior to removal, and not any post-removal pay increases. *Higgins v. Marshall,* 584 F.2d 1035, 1037 (1978), *cert. denied,* 441 U.S. 931, 99 S.Ct. 2051, 60 L.Ed.2d 659 (1979).

In addition to the FMHSA MRP, the Secretary previously had promulgated an asbestos MRP, pursuant to his power under the OSH Act. This standard provided MRP benefits that were as narrow in scope as the FMHSA MRP. 29 C.F.R. 1910.-1001(g)(3)(iv) (1986) (a worker transferred because unable to wear a respirator must be "given ... the same seniority, status and *rate of pay* he had just prior to such transfer.") (emphasis added).

It is beyond cavil that the Secretary's experience with these two provisions informed his decision to promulgate the broad MRP contained in the lead standard, which was "relatively without precedent in earlier standards." *Steelworkers,* 647 F.2d at 1206. A central goal of the lead standard's MRP benefits was to secure worker-cooperation with the medical surveillance component of the rule. *See, e.g.,* 43 Fed.Reg. at 54467 ("MRP is directed toward worker reluctance to meaningfully participate in medical surveillance due to fear of economic loss."). The Secretary expressly and extensively referenced his experience under the FMHSA MRP benefits program, which had been less than salutary. *Id.* at 54447–49.

The preamble is replete with references to the deficiencies inherent in limited forms of MRP benefits. *See, e.g., id.* at 52973, 52977. Thus, the preamble to the lead standard notes that eight years "[e]xperi-

ence [in administering the Black Lung Surveillance and Transfer Program] demonstrates that economic disincentives do adversely affect worker participation in medical surveillance programs, even where job transfer and *limited* economic protection are guaranteed." *Id.* at 54447 (emphasis added). After noting that a relatively small percentage of miners chose to participate in the voluntary medical surveillance and transfer programs of the FMHSA, the Secretary concluded "that concern by miners over adverse economic consequences contributes to the low level of participation." *Id.* at 54448. The Secretary also referenced the "limited" asbestos MRP benefits provision in the preamble, *id.* at 54441, noting that "[e]vidence in the record also points toward worker nonparticipation in medical surveillance" under this standard. *Id.* at 54443.

After specifically referring to the D.C. Circuit's decision in *Higgins, id.* at 55448, the Secretary summarized the evidence garnered in administering the FMHSA MRP benefits program, which "demonstrates that ... earnings concerns can dramatically undermine efforts to protect worker health. OSHA has adopted MRP specifically to minimize the adverse impact of these factors on the level and quality of worker participation in the medical surveillance provided by the final lead standard." *Id.* at 54449. Thus, the Secretary was "significantly influenced by the black lung medical surveillance and transfer program ... [which] reveals the extent to which economic disincentives adversely affect participation even in programs where job transfer and *limited* economic protection are guaranteed." *Id.* at 54442 (emphasis added).

Notably, both the black lung and the asbestos MRP provisions use the phrase "rate of pay," and the Secretary characterized these programs as "limited." By contrast, the MRP benefits provision in the lead standard uses the term "earnings" and was meant to be unprecedented in scope. Consequently, it is more than reasonable to conclude that the Secretary meant "earnings" to mean something more comprehensive than simply a worker's base hourly wage, contrary to the Commission's finding (and appellees' argument) that "earnings" and "rate of pay" were used synonomously. *Cf. Higgins,* 584 F.2d at 1037 ("rate of pay" is an unambiguous term).

There is other evidence in the rulemaking record that supports the Secretary's interpretation that "earnings" includes premium payments such as those at issue here. During the comment period, the USWA requested that the Secretary "list all the possible forms of direct and indirect compensation which an employer might have normally given a worker in the absence of removal." 43 Fed.Reg. at 54466. The Secretary "rejected the adoption of such a definition because it would likely be confusing to some employers in light of the many contexts in which the standard will apply." *Id.* While other inferences may reasonably be drawn, it is reasonable to infer that, had the Secretary simply meant MRP benefits to embrace only an employee's base wage, there would have been no danger of "confusion to some employers," and the Secretary would have so stated. In contrast to premium payments, which take on varying meanings in different employment contexts, a worker's base hourly wage strikes us as unambiguously straightforward and without need of explanation. *See Higgins,* 584 F.2d at 1037.

There is evidence in the record, moreover, that the Secretary intended to include within "earnings" precisely the kind of premium payments at issue here. Rather than comply with the USWA's request for a detailed explanation of what MRP benefits include, the Secretary explained that

the employer must maintain the earnings, seniority, and other employment rights and benefits of a worker as though the worker had not been removed ... In most cases this will simply mean that an employer must maintain the rate of pay of a worker transferred ... The standard, however, uses the all-encompassing phrase "earnings, seniority, and other employment rights and benefits" to assure that a removed worker suffers

neither economic loss nor loss of employment opportunities due to the removal. 43 Fed.Reg. at 54466. The Secretary then gave an example of the scope of the term in dispute, explaining that incentive pay was comprehended within "earnings." "In situations where the earnings of a removed worker had been in part based on a piece work rate of pay, the standard necessarily obligates the employer to make a good faith estimation of the worker's likely earnings but for the removal, and maintain those earnings during the period of removal." *Id.* It is manifestly reasonable, therefore, to infer that the Secretary intended to include lost production bonuses and payment for lost overtime opportunities, which similarly must be estimated.

Given the preamble's near obsession with ensuring that workers sustain no "economic loss" because of removal, *see, e.g., id.,* it is reasonable to conclude that the Secretary intended the standard to include any and all payments and benefits [4] that the worker would have received from his or her employer but for the removal. One "objective of the MRP provision is that employees who are temporarily removed from lead exposure should not suffer *any* loss of income." *RSR Corp.,* 764 F.2d at 363 (emphasis added). Production bonuses, shift differential and overtime pay are, without doubt, forms of economic income. These premium payments increase one's disposable income, permitting one to increase consumption or savings. *Cf. Lukhard v. Reed,* —— U.S. ——, 107 S.Ct. 1807, 95 L.Ed.2d 328 (1987). Conversely, not even an economist could deny that if a worker is refused these payments, he or she will sustain a loss of income, an economic loss.

Moreover, failure to maintain these premium payments would, by definition, provide an economic disincentive to voluntary worker cooperation in the medical surveillance program, thus defeating a central purpose of the MRP benefits provision.[5] 43 Fed.Reg. at 52973, 54442–47; *see Steelworkers,* 647 F.2d at 1275 (evidence adduced during the rulemaking proceedings demonstrates that the majority of workers would choose health endangerment and noncooperation "if not guaranteed all their wage and seniority rights during removal.")

Finally, a broad interpretation of "earnings" is consistent with another central purpose of the standard: "MRP is meant to place such costs of worker protection directly on the industry rather than on the shoulders of individual workers unfortunate enough to be at risk of material impairment to health due to occupational exposure to lead." 43 Fed.Reg. at 54441. Were we to take the Commission's and appellees' view as to the scope of MRP, we would place considerable costs on the exposed workers, rather than on the industry, thus vitiating "its role as an economic incentive for employers to comply with the organic lead standard." *Id.* at 54449.

We have considered carefully both the decision of the Commission and all the arguments of the appellees. Much of what appellees argue is addressed to whether MRP benefits represent sound policy. Many of these same arguments were expressly addressed by the Secretary.[6] It is

---

**4.** The Secretary argues alternatively that a paid lunch break is a "benefit," which must be maintained "as though the employee had not been removed from normal exposure to lead." 29 C.F.R. 1910.1025(k)(2)(ii). This interpretation strikes us as reasonable and we therefore defer to it.

**5.** "Administrative regulations are to be interpreted broadly and liberally to effectuate their central purposes." *Pennzoil,* 645 F.2d at 384.

**6.** For example, St. Joe asserts that these payments would represent "windfall income" to removed employees since they did not actually work the overtime or the undesirable shift during the period of their removal. But the stan-

dard plainly contemplates that employees will be compensated at their pre-removal level even if their working hours are reduced or they must be laid-off. *Id.* at 52973, 52975, 52976; *see RSR Corp.,* 764 F.2d at 363; *Steelworkers,* 647 F.2d at 1230. Therefore, the Secretary—acting on policy grounds with the imprimatur of Congress—chose to promulgate a "windfall income" provision with its concomittant benefits and dangers rather than to risk providing economic disincentives to worker-cooperation by not requiring employers to pay such compensation.

the agencies and not the courts that are charged with policymaking. Thus, the argument that these payments are not necessary to induce employee cooperation, and may even cause employees intentionally to overexpose themselves to lead, is beside the point. *See American Textile Mfgrs. Institute v. Donovan,* 452 U.S. 490, 541, 101 S.Ct. 2478, 2506, 69 L.Ed.2d 185 (1981).

OSHRC's and appellee's observation that "rate of pay" and "earnings" are often used interchangeably in the preamble is certainly accurate, and may evidence inartfulness on the part of the Secretary. In light of the rulemaking history, however, we cannot but conclude that the Secretary's interpretation is reasonable. Our conclusion is buttressed by what is in essence an interpretive bulletin issued by the Secretary one year after promulgation of the lead standard, for mandatory distribution to the employees in the industry. 44 Fed.Reg. 60987 (Oct. 23, 1979) (codified at 29 C.F.R. § 1910.1025 Appendix B). This bulletin informs employees that "[e]arnings includes more than just your base wage; it includes overtime, shift differentials, incentives, and other compensation you would have earned if you had not been removed." We defer to this reasonable and contemporaneous interpretation of the scope of MRP benefits. *See Power Development Co. v. Electrical Workers,* 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924 (1961); *Peters v. City of Shreveport,* 818 F.2d 1148, 1155 & n. 4 (5th Cir.1987).

## IV. Pre-enforcement Notice

Amax contends that the MRP benefits provision as so interpreted nevertheless is unenforceably vague, that the language of the standard did not provide adequate notice of what was required of employers. This argument is devoid of merit.

▮ Irrespective of the murkiness in the language and the meaning of the MRP standard, the language of Appendix B is crystal clear. The Secretary published this appendix in the C.F.R. well before any employer was cited for failing to meet the requisites of the MRP benefits provision. It therefore provided reasonable and fair advance warning to employers of the compensation mandated during an employee's removal. *See S & H Riggers & Erectors, Inc. v. OSHRC,* 659 F.2d 1273, 1282 (5th Cir.1981).

For the foregoing reasons, this case is REVERSED and REMANDED for further proceedings attuned to this opinion.

EDITH H. JONES, Circuit Judge, dissenting:

There is little doubt that, following appropriate rulemaking procedures, the Secretary of Labor could have promulgated an MRP benefits regulation assuring employees transferred to non-lead-exposed areas not only their pre-transfer hourly wage, but also guaranteed overtime, shift differentials, paid lunch hours, etc. The Secretary did not, however, give employers fair notice that "earnings," as used in 29 CFR § 1910.1025(k)(2)(ii), would be so construed. I therefore respectfully dissent from Judge Goldberg's able and persuasive opinion. I would hold the broadened MRP "earnings" standard void for failure to comport with due process and the requirements of notice and comment rulemaking.

MRP provisions enacted prior to the lead standard protected only an employee's hourly rate of pay. Federal Coal Mine & Safety Act of 1969, 30 U.S.C. §§ 801–962, at § 843(b)(3); the asbestos standard, 29 C.F.R. § 1910.1001(d)(2)(iv)(c); proposed coke oven emission standard, 41 Fed.Reg. 46780. The Secretary's first proposed lead-exposure standard, interestingly, contained no MRP provision. 40 F.R. 45934. When he extended the comment period to consider an MRP provision, he referred interchangeably to maintaining the "rate of pay" of a transferred employee and protecting the employee so there would be no "loss of earnings." 42 Fed.Reg. 46547, 46549 (September 17, 1977). This language used in regard to the lead standard MRP rate retention program parallels that of the preceding statute and regulations. The majority acknowledge that the interchangeable use of "rate of pay" and "earnings" in the preamble to the final regulation is

"inartful." [1] I think it is more than that. Despite the Secretary's later discovery of expanded protection for MRP–transferred employees, no comments were received from industry during the lead MRP rulemaking concerning the impact of MRP on such diverse matters as paid lunch hours, overtime not actually worked, or transfers for disciplinary reasons. [2]

The majority cite the preamble to the final rule as evidence of the Secretary's intent to broaden the definition of "earnings" from prior usage. However, what may have been predictable at the time the final rule was issued was not necessarily predictable during the comment period. During the comment period, the best indication of the Secretary's intentions to interested parties was his prior usage of the terms. Moreover, the Secretary admits that "earnings" had a much narrower meaning when previously used.

One year after promulgating the lead standards, the Secretary issued an explanatory bulletin that first propounded an expanded definition of "earnings" for MRP purposes. This definition holds employers responsible for a broad range of MRP payments they did not previously know they would bear. [3] The payments will be expensive, inasmuch as they may afford more compensation to transferred employees than they previously received. [4] Their application is ambiguous, because the Secretary's case-by-case approach does not inform employers exactly when and how compensation beyond the employee's usual hourly rate must be paid. Should overtime, for example, be paid to a transferred employee based on that employee's personal prior overtime record, the average historical overtime record for the department from which he transferred, or the average overtime during the period while he is transferred? One need not exhaustively recount the possible forms of "compensation" covered by MRP—the Christmas party, the production bonus, etc.—or the myriad ways in which such compensation could be computed to conclude that the Secretary's definition of "earnings", adopted by the majority, represents a complex and significant graft onto the scope of MRP protection.

The potential cost of expanded MRP benefits to employers, the inherent ambiguity of the construction urged by the Secretary, and the departure from the Secretary's prior use of "earnings" synonymously with "rate of pay" all strongly suggest that the Secretary should have afforded precise, prior notice of his rulemaking intentions to the public. Rulemaking by afterthought is unfair. Two purposes of notice and comment rulemaking are to afford interested persons the opportunity to participate in the agency regulatory process and to expose the agency to the practical implications of its actions. *Chamber of Commerce of United States v. OSHA*, 636 F.2d 464, 470–71 (D.C.Cir.1980). That the Secretary did not adequately open this issue for evaluation is nowhere more evident than in the fact that not a single comment was

---

1. In the preamble to the lead standard, 43 Fed. Reg. 52952ff and 54354, the Secretary stated "in most cases this [the requirement to maintain earnings, etc.] will simply mean that an employer must maintain the *rate of pay* of a worker transferred to a low-lead-exposure job," (emphasis added).

2. The Secretary's ambiguous response in declining the steelworkers' request for a definition of "earnings," 43 Fed.Reg. 54466, can hardly been said to have alerted employers that a considerably broader MRP provision was about to be implemented. In any event, this response accompanied publication of the final lead standard, including its MRP provision, and came too late to permit effective opposition by industry.

3. 44 Fed.Reg. 60980, 60987 (Oct. 23, 1979). Indeed, the fact that the Secretary issued this appendix after rejecting the United Steel Workers' request for a similarly expansive definition in the original rule is evidence that the appendix represents a change in the regulations. This type of change cannot be accomplished with a mere appendix. Rather, full notice and comment procedures must be followed.

4. As the appellees here contend, the Secretary's citations require them, e.g., to pay overtime for hours not worked, to pay eight and a half hours' wages for an eight hour work day (to compensate for previous paid lunch periods), and to pay employees who were transferred solely because they failed to comply with safety procedures designed to lessen their lead exposure.

received from industry, during the rule-making, explaining the difficulties in expanding MRP protection beyond an employee's hourly rate of pay. The purposes of notice and comment rulemaking were plainly unfulfilled.

Due process also counsels against enforcing the Secretary's citations against these appellees. Our Court has not hesitated to vacate enforcement proceedings initiated by the Secretary on unclear regulations. As we have said, "An employer ... is entitled to fair notice in dealing with his government. Like other statutes and regulations which allow monetary penalties against those who violate them, an occupational safety and health standard must give an employer fair warning of the conduct it prohibits or requires, and it must provide a reasonably clear standard of culpability to circumscribe the discretion of the enforcing authority and its agents.... If a violation of a regulation subjects private parties to criminal or civil sanctions, a regulation cannot be construed to mean what an agency intended but did not adequately express." *Diamond Roofing v. OSHRC*, 528 F.2d 645 (5th Cir.1976). More recently, we emphasized that "Due process mandates that an employer receive notice of the requirements of any OSHA regulation before he is cited for an alleged violation." *S & H Riggers and Erectors v. OSHRC*, 659 F.2d 1273, 1279 (5th Cir.1981).

In my view, the Secretary's construction of "earnings," following a clear history in which that term was used to mean hourly rate retention, cannot be expanded to include non-hourly-rate MRP provisions without notice and comment rulemaking procedures. The Secretary's contrary contention here bids fair to place him on a level with Humpty Dumpty. "When *I* use the word," Humpty Dumpty said in a rather scornful tone, "it means just what I choose it to mean—neither more nor less." Lewis Carroll, *Through the Looking Glass.* Publishing an explanatory bulletin on lead MRP benefits a year after the regulation was implemented cannot repair the Secretary's failure to engage in proper rulemaking. The Secretary's definition of "earn-

ings," in these circumstances, is therefore unreasonable. I respectfully dissent.