Ann McLAUGHLIN,[*] Secretary of Labor, Petitioner,

and

United Steelworkers of America, AFL–CIO–CLC, Petitioner–Intervenor,

v.

ASARCO, INC., Respondent.

No. 87–7088.

United States Court of Appeals, Ninth Circuit.

Argued Dec. 7, 1987.

Submitted Dec. 11, 1987.

Decided March 16, 1988.

---

[*] Ann McLaughlin has been substituted for William E. Brock, III. Fed.R.App. P. 43.

Jeffrey A. Hennemuth, Dept. of Labor, Washington, D.C., for petitioner.

Jeffrey T. Johnson, Holland & Hart, Denver, Colo., for respondent.

Before WRIGHT, ANDERSON, and SCHROEDER, Circuit Judges.

SCHROEDER, Circuit Judge:

The Secretary of Labor petitions for review of an order of the Occupational Safety and Health Review Commission ("OSHRC" or "Commission"). The order dismissed the Secretary's citation against ASARCO, a lead smelter operator, for violating the medical removal protection benefits promulgated by the Secretary for the benefit of employees who have suffered occupational exposure to lead. The case arises because of a dispute between the Secretary and the Commission over the proper interpretation of the regulations promulgated by the Sec-

retary. This dispute concerns 29 C.F.R. § 1910.1025(k)(2)(ii), which requires employers to maintain the earnings of employees removed from lead exposure as though the employees had not been removed. The Secretary maintains that this provision entitles removed employees to the overtime pay they would have received in their regular job positions, and cited ASARCO for failure to make such payments. Because the Commission previously had ruled that employees were not entitled to such overtime benefits in *Secretary of Labor v. Amax Lead Co./Schuylkill Metals Corp./St. Joe Resources*, 1986–87 OSHD ¶ 27,629 ("*Amax Lead*"), the citation was dismissed. The *Amax Lead* decision was subsequently reversed by the Fifth Circuit in *United Steelworkers of America v. Schuylkill Metals Corp.*, 828 F.2d 314 (5th Cir.1987).

ASARCO defends the dismissal on the grounds that the Commission's interpretation is entitled to deference under the law of this circuit and is the more reasonable one. It also argues that even if the regulations do say what the Secretary says they mean, the provision is invalid due to lack of notice and opportunity for rulemaking comment. We hold, in line with the Secretary's arguments, that the plain language of the regulation precludes a narrow interpretation. The benefits are intended to prevent an employee from suffering any economic loss due to removal for lead exposure, and this includes protection from loss of overtime. We thus reach a result in accord with that reached by the Fifth Circuit, the only other circuit to address this issue. *Schuylkill Metals*, 828 F.2d at 314.

The standard regulating occupational exposure to lead is contained in 29 C.F.R. § 1910.1025, promulgated pursuant to the Occupational Safety and Health Act of 1970, 29 U.S.C. § 655(b)(2). Under that standard, an employer must remove an employee from excessive lead exposure if the employee's blood lead level exceeds certain limits[1] or if the employee has a medical condition placing the employee at an increased risk of material impairment to his or her health from continued exposure to

1. The regulation requires employers to provide medical surveillance of lead exposure through blood testing of employees. 29 C.F.R. § 1910.1025(j). If the employee has a blood

lead.[2] The standard does not specify what the employer must do with the removed employee, leaving open the possibilities of transferring the employee to another position with a low lead exposure, temporarily laying off the employee, or having the employee work shorter hours at his or her regular position.

Regardless of which option the employer chooses, however, whenever an employee is removed from exposure to lead or otherwise limited, the employer must provide the employee up to eighteen months of "medical removal protection benefits," defined as:

(ii) *Definition of medical removal protection benefits.* For the purposes of this section, the requirement that an employer provide medical removal protection benefits means that the employer shall maintain the earnings, seniority and other employment rights and benefits of an employee as though the employee had not been removed from normal exposure to lead or otherwise limited.

29 C.F.R. § 1910.1025(k)(2)(ii).

Appendix B to this regulation, which summarizes the provisions for interested employees, states flatly that, "Earnings includes more than just your base wage; it includes overtime, shift differentials, incentives, and other compensation you would have earned if you had not been removed." 29 C.F.R. § 1910.1025 App. B at 806. Thus, if the Appendix accurately summarizes the regulation, then overtime pay is included in medical removal protection benefits.

The facts in this case are straightforward. ASARCO operates a lead smelter in East Helena, Montana. An OSHA compliance officer inspected the plant following a complaint by the United Steelworkers of America that ASARCO was not paying medically removed employees the overtime that they would have earned if not removed. On January 23, 1986, the Secretary issued a citation against ASARCO for not paying three medically removed employees overtime wages as part of their medical removal protection benefits. ASARCO contested the citation before an administrative law judge, and the Union intervened as the authorized employee representative. The parties stipulated to the facts and submitted the matter on the briefs. The administrative law judge dismissed the citation, holding that the overtime pay issue was controlled by OSHRC's previous ruling that removed employees are not entitled to overtime benefits. The ALJ relied on *Amax Lead*, 1986–87 OSHD at ¶ 27,629, which was recently reversed by the Fifth Circuit. *Schuylkill Metals*, 828 F.2d at 314. The Secretary petitioned the Commission for discretionary review of the administrative law judge's order, but the Commission did not direct review, and thus the administrative law judge's dismissal became the final order of the Commission on January 5, 1987. The Secretary appeals pursuant to 29 U.S.C. § 660(b).

■ The position of the Commission, mirrored in the brief of ASARCO, is based upon the use of the word "earnings" in the regulations' definition of medical removal protection benefits. The Commission holds that because that word by itself has no common meaning that would include overtime, we should look for guidance to the first federal law containing MRP benefits provisions, the Federal Coal Mine Health and Safety Act, and subsequent regulations promulgated pursuant to it. This statute required removed employees to be paid the regular "rate of pay" rather than "earnings." 30 U.S.C. § 843(b)(3). This

---

lead level exceeding a specified amount—50 micrograms per 100 grams of blood when the provision is fully phased in—the employer must remove the employee from exposure to lead above the "action level" (30 $\mu g/m^3$). 29 C.F.R. § 1910.1025(k). When two consecutive blood tests reveal a blood lead level of 40 micrograms per 100 grams of blood, the employee may return to his or her regular position. 29 C.F.R. § 1910.1025(k)(1)(iii).

**2.** Under section 1910.1025(k)(1)(ii), an employer must remove an employee from exposure to lead above the action level if the employee "has a detected medical condition which places the employee at increased risk of material impairment to health from exposure to lead." If the employee's medical condition changes, and lead exposure no longer increases the risk of a material health impairment, the employee may return to his or her regular position. 29 C.F.R. § 1910.1025(k)(1)(iii)(A)(4).

provision was interpreted to mean that a removed worker may be paid only at the hourly wage he or she was receiving prior to transfer, rather than the amount, including overtime and subsequent pay increases, that he or she would have earned if not transferred. *See Amax Lead,* 1986–87 OSHD at 35,923–24.

The difficulty with this argument is that it focuses solely, and out of context, upon the word "earnings." It ignores the full definition of the medical removal benefit, which is that "earnings" as well as "seniority and other" employment benefits are to be maintained "as though the employee had not been removed from normal exposure to lead or otherwise limited." This means that the employee must not receive less than the employee would have received if he or she had not been removed, and that would include overtime pay.

The preamble and statement of reasons included with the lead standard when it was promulgated in 1978 explain the matter more fully. It states that while in most cases this would simply mean that an employer must maintain the rate of pay of a transferred worker, this standard "uses the all-encompassing phrase 'earnings, seniority, and other employment rights and bene-

fits' to assure that a removed worker suffers neither economic loss nor loss of employment opportunities due to the removal." The preamble made particular reference to the problem of piecework, observing that the regulation obligated the employer to make a good faith estimation of the likely earnings.[3] Piecework involves paying an employee based on the number of units completed, and thus necessitates calculations more specific and individualized than mere use of an employee's rate of pay. It is therefore noteworthy that piecework was specifically mentioned, since the explanation reflects the intent to maintain the employee's earnings as if no removal had occurred.

Any remaining doubts concerning the inclusive intent of the regulation are further dispelled by Appendix B, which explains to employees that "earnings" include overtime. The Commission points out that the Appendix cannot be regarded as contemporaneous evidence of the Secretary's intent at the time the regulation was issued because the Appendix was issued almost a year later. However, it cannot be discounted completely. We observe that it is in accord with the consistent position taken by the Secretary since the regulation was promulgated in 1978.

---

**3.** The preamble and statement of reasons to the lead standard at its promulgation in 1978 stated that:

> f. *Definition of medical removal protection benefits.* The standard requires an employer to provide MRP benefits to a worker on each occasion that a worker is removed from exposure to lead or otherwise limited. This requirement is defined as meaning that the employer must maintain the earnings, seniority, and other employment rights and benefits of a worker as though the worker had not been removed or otherwise limited. In most cases this will simply mean that an employer must maintain the rate of pay of a worker transferred to a low lead exposure job. *The standard, however, uses the all-encompassing phrase "earnings, seniority, and other employment rights and benefits" to assure that a removed worker suffers neither economic loss nor loss of employment opportunities due to the removal.* The United Steelworkers of America urged that the standard include a detailed definition of the term "earnings," listing all the possible forms of direct and indirect compensation which an employer might have normally given a worker in the absence of a removal.... OSHA rejected the adoption of

such a detailed definition because it would likely be confusing to some employers in light of the many contexts in which the standard will apply. *To comply with the standard, an employer need only maintain the removed worker as though no removal had occurred. In situations where the earnings of a removed worker had been in part based on a piece work rate of pay, the standard necessarily obligates the employer to make a good faith estimation of the worker's likely earnings but for the removal, and maintain those earnings during the period of removal.*

> The standard's broad economic protection for removed workers results from the reasons for MRP's adoption. MRP is an integrated preventive health program combining temporary medical removals with economic protection for removed workers. MRP is essential to effectuate meaningful worker participation in the standard's medical surveillance program and MRP is also an appropriate means of allocating the control costs of temporary medical removals. From these considerations flow the standard's minimization of economic loss to removed workers.

> 43 Fed.Reg. 54,466 (emphasis added).

ASARCO also argues, with a certain amount of circularity, that if the regulation is interpreted as including overtime, then there was insufficient notice of what amounted to a change in the preceding law and which required independent notice in the rulemaking. The Fifth Circuit discussed this issue in depth and rejected this contention. *Schuylkill Metals*, 828 F.2d at 317–18. The Fifth Circuit noted that on September 16, 1977, the Secretary provided notice in the Federal Register of an additional comment period as to "whether, *and to what extent*, the [proposed lead] standard should require employers to protect employees who submit to medical surveillance and as a result are removed from lead exposures in order to preserve the employees' health." 828 F.2d at 318, *quoting* 42 Fed.Reg. 46,547. The Fifth Circuit also noted that the Secretary requested comments and information relating to thirteen specific issues, and concluded that these

> questions and descriptions more than adequately sufficed to apprise fairly an interested party that there was an issue regarding the breadth of MRP benefits. To apprise fairly interested parties—such as these sophisticated industry members who had challenged the lead standard along every step of the road—it certainly was not necessary that the Secretary spell out with particularity the proposed meaning of MRP benefits or "earnings." ... Additionally, the evidence received and cited in the rulemaking history demonstrates that a comprehensive definition of "earnings" was a logical outgrowth of the rulemaking proceedings.

828 F.2d at 318.

The Fifth Circuit also addressed the same arguments that have been presented to us with respect to the word "earnings." ASARCO argues that we should not follow the Fifth Circuit on the merits of this interpretation issue because we apply a different standard of review than that used in the Fifth Circuit. The deference standard, of course, is less relevant to the rulemaking issue since it does not focus on an issue of interpretation.

It is true that there is a split of authority in the circuits concerning whether more

deference is due the Commission's interpretation or the Secretary's. The First, Fifth, Seventh, and Tenth Circuits defer to the Secretary; the Second, Fourth, Sixth, and Eighth Circuits defer to the Commission; the Third Circuit defers to neither but instead conducts an independent review. *See Schuylkill Metals*, 828 F.2d at 319 n. 3 (and cases cited therein). This court defers to the Commission's interpretation when it is "at odds" with the Secretary's. *Brock v. Bechtel Power Corp.*, 803 F.2d 999, 1000 (9th Cir.1986).

Under any standard, however, the Commission's interpretation cannot be upheld if it is in conflict with the plain meaning of the regulation itself; our deference is not blind. *See Hart v. Bowen*, 799 F.2d 567, 569 (9th Cir.1986); *Electric Smith, Inc. v. Secretary of Labor*, 666 F.2d 1267, 1270–71 & n. 6 (9th Cir.1982). This disagreement with the Fifth Circuit as to the degree of deference to be paid to the Secretary's views does not require a further circuit division on the merits of this dispute.

The order of the Commission is reversed and the matter is remanded for further proceedings.